# In the United States Court of Federal Claims

No. 11-048 C
(Filed:  December 3, 2013)

```
*****************************************
```

|  |  |  |
|---|---|---|
| COFFEE CONNECTIONS, INC., | * | Concession Contracts; Breach of Contract |
|  | * | Motion to Dismiss RCFC 12(b)(1); |
| Plaintiff, | * | Motion for Summary Judgment RCFC 56; |
|  | * | Breach of Contract for Critical Violations |
| v. | * |  |
|  | * |  |
| THE UNITED STATES, | * |  |
|  | * |  |
| Defendant. | * |  |

```
*****************************************
```

Cyrus E. Phillips, IV and Michael E. Stamp, Arlington, VA, for plaintiff.

Sarah M. Bienkowski, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

This case arises out of a concession contract between the Army and Air Force Exchange Service ("AAFES" or "defendant") and Coffee Connections, Inc. ("plaintiff") for the operation of a deli/snack bar, TJ's Deli, at Fort Belvoir, Virginia.  Plaintiff's amended complaint alleges breach of contract and seeks damages in the amount of $42,727 in termination-related costs and $8,500 for thirty-days lost profits.  Defendant requests dismissal of plaintiff's amended complaint for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") or, alternatively, for summary judgment pursuant to RCFC 56.  For the reasons set forth below, the court hereby denies defendant's motion to dismiss and grants defendant's motion for summary judgment.

## FACTUAL BACKGROUND

### A.  The Contract

On December 16, 2008, the AAFES awarded Concession Contract BEL 08-142 ("contract") to plaintiff for the operation of a deli/snack bar, TJ's Deli, for a three-year term from January 15, 2009, to January 14, 2012, at Fort Belvoir, Virginia.[1]  App. 203, 208.[2]  Tommy

---

[1]  The facts contained herein are taken from the parties' filings and are not in dispute.

Johnson, president of Coffee Connections and manager of TJ's Deli, executed the contract on plaintiff's behalf.

The contract provided three ways for termination, only two of which are pertinent in this case.  App. 212.  First, the contract permitted an immediate termination of the contract by either party for breach.  Id.  Second, the contract allowed either party to terminate with a thirty-day written notice.  Id.  The contract also provided that any failure by the AAFES to enforce or require strict performance of the terms of the contract would not constitute a waiver of the relevant contract provision.  App. 213.

The contract also contained a disputes clause, which provided in relevant part:

11.  DISPUTES (FEB 95)

    a.  This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613[3]).  Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

    b.  "Claim" as used in this clause means a written demand or written assertion by one of the contracting parties seeking the payment of money in a sum certain or other relief arising under or relating to this contract.  A voucher, invoice or other routine request for payment that is not in dispute when submitted is not a claim under the Contract Disputes Act.

    c.  A claim by the contractor shall be made in writing and submitted to the contracting officer for a written decision.  A claim by AAFES against the contractor shall be made by a written decision by the contracting officer.

    .  .  .  .

    f.  The contracting officer will mail or otherwise furnish a written decision in response to a contractor claim, within the time periods specified by law.  Such decision will be final and conclusive unless:

        (1) Within 90 days from the date of contractor's receipt of the final decision the contractor appeals the decision to the Armed Services Board of Contract appeals (ASBCA), or

---

[2] "App. __" refers to defendant's appendix filed on in conjunction with its motion to dismiss or, in the alternative, for summary judgment, filed on May 6, 2013.

[3] The Contracts Dispute Act of 1978 ("CDA") has been recodified at 41 U.S.C. §§ 7101 – 7109 (2006 & Supp. V 2011).

> (2) Within 12 months from the date of contractor's receipt of the final decision the contractor brings an action in the United States Court of Federal Claims.

App. 212-13.

In addition, the concession contract contained performance provisions governing, among other things, food safety, health, hygiene, sanitation, and routine inspections.  App. 204, 227-29, 244, 251-52.  For instance, the concession contract provided that the "[c]oncessionaire will keep the premises clean, orderly, secure, and sanitary" and "comply with the installation/exchange fire, safety and security regulations and applicable health and sanitation and environmental protection regulations."  App. 228.  The contract required "[f]ood sales areas [to] comply with military public health and sanitation criteria to include cleanliness of equipment, utensils, display areas, adequate refrigeration for perishable foods and proper time and dating of food stuffs, according to TB MED 530 and AFI 48-116."  App. 251.  Sales areas would also be "subject to routine and special medical inspections without notice."  Id.  Further, all items for sale were required to "comply with shelf life limitations determined by the base/post veterinarian."  Id. Food service sanitation training was also required by the contract.  App. 252.

The concessionaire, manager, and employees operating a food service facility were all required to meet the training requirements.  Id.  Additionally, the contract provided that the employees were required to wear clean uniforms, maintain a high degree of personal cleanliness, and conform to hygienic practices.  Id.  Services were to be provided "equal to those provided by first quality commercial establishments."  App. 230.

In order to comply with the regulations, the contract required plaintiff "to present a copy of [the] contract in person to the installation Preventative Medicine Officer/NCOIC in order that Public Health standards and practices can be explained and reference obtained."  App. 252.  At the time the contract was executed, Preventative Medicine Officers were part of a section called Preventative Medicine Activity ("MEDDAC"), within the United States Army Medical Department Activity.  These individuals were responsible for conducting Routine Food Establishment Inspections and Preventative Medicine Assistance Visits to ensure compliance with Technical Bulletin MED 530 ("TB MED 530"), Occupational and Environmental Health Food Sanitation (Oct. 30, 2002).  App. 1-200; Decl. of Maria Gamble; Decl. of James Johnson.

As noted above, the contract required compliance with TB MED 530, App. 25-190, as well as other military public health and sanitation criteria.  Indeed, Exhibit H to the concession contract specifically references TB MED 530.  App. 251.  The purpose of TB MED 530 is to safeguard public health and ensure that food is safe, unadulterated, and honestly presented when offered to the consumer and it "applies to all FOOD ESTABLISHMENT operations within the U.S. Army and areas under its control, including . . . AAFES . . . ."  App. 36, 48.  It was implemented in 1997 at the direction of the President of the United States as an initiative to "reduce the number of foodborne illnesses."  App. 36.  The intent of TB MED 530 "is to place primary emphasis on the food and the food employees handling the food without neglecting or compromising the need for a strong sanitation program."  The focus of TB MED 530 "is to understand the causes of foodborne illnesses, by observing food preparation and handling practices, and to implement controls . . . ."  App. 36.

**B.  Inspections**

On January 15, 2009, the date the contract commenced, Maria Gamble, a MEDDAC inspector, conducted a Routine Food Establishment Inspection of TJ's Deli.  App. 257-58; Decl. of Maria Gamble.  From the start, Ms. Gamble identified noncritical violations of TB MED 530 in her inspection report:  food debris and dirt on the floor of the walk-in refrigerator, filth inside the interiors of the reach-in refrigerators used to hold salads or desserts, trash and dirt on the floor near the coolers, and trash inside the cabinets of the retail counter.  App. 257; Decl. of Maria Gamble.  She also noted items in need of repair, such as the air curtain at the back door and a broken reach-in refrigerator.  Id.  At the conclusion of this inspection, Ms. Gamble recorded these violations as noncritical resulting in a satisfactory rating.  Id.

The next month, on February 20, 2009, James Johnson, another MEDDAC inspector, conducted another Routine Food Establishment Inspection.  App. 259-60; Decl. of James Johnson.  During this inspection, Mr. Johnson noted nine noncritical violations of TB MED 530.  For instance, he found items in need of repair:  a hole in the wall near the slicer in the kitchen area and a broken reach-in refrigerator near the hand-washing sink.  App. 259; Decl. of James Johnson.  Mr. Johnson further noted that the ice cream machine and the wall behind the ice cream machine were both dirty, the entire kitchen area was in need of sweeping, rodent droppings were found in the cabinet for fountain drinks, and a cockroach was found in a pest trap.  App. 259-60.  He also identified three employee violations:  an employee wearing earrings, an employee without a hair restraint, and an employee placing a food ticket on top of a meal during preparation.  Id.; Decl. of James Johnson.  Despite these violations, Mr. Johnson rated TJ's Deli satisfactory.  App. 259.

On March 16, 2009, Ms. Gamble returned to the deli for her second Routine Food Establishment Inspection.  App. 261-62; Decl. of Maria Gamble.  In her inspection report, she identified two noncritical repeat violations:  a hole in the wall near the slicer in the kitchen area and a broken reach-in refrigerator near the ice cream machine.  Id.  Again, she gave the deli a satisfactory rating.  Id.

Then, on April 2, 2009, during an inspection by Sergeant Matthew McKee, the violations rose to the critical level as defined under TB MED 530.[4]  App. 263-64.  Specifically, the critical violations included:  three one-gallon containers of milk with a sell-by date of March 31, cheese used in the preparation of sandwiches sitting out without refrigeration, and unlabeled raw chicken stored in a metal container in a reach-in refrigerator without a date of preparation.  Id.  Sergeant McKee additionally identified three noncritical violations:  unclean areas to sight and touch, evidence of rodents, and an employee in the food preparation area without a hair restraint.  App. 264.  On this day, for the first time, TJ's Deli received an unsatisfactory rating.  App. 263.

Due to the unsatisfactory rating, Sergeant McKee conducted a follow-up inspection eleven days later, on April 13, 2009.  App. 265-66.  This inspection found one critical violation of the TB MED 530, the preparation of lettuce in the same sink as current dish-washing activities.  Id.  He also found four noncritical violations:  meat in the walk-in refrigerator without

---

[4]  A "critical" item "is more likely than other violations to contribute to food contamination, illness, or an environmental health hazard."  App. 164.

secondary containment, soda spigots with dried syrup and other debris, styrofoam cups stored directly on the ground, and continued evidence of rodents.  Id.  Even with these findings, however, the deli received a satisfactory rating.  App. 265.  This passing grade was short-lived.

Approximately six weeks later, on May 28, 2009, plaintiff received another unsatisfactory rating following a Routine Food Establishment Inspection conducted by Mr. Johnson.  App. 267-68; Decl. of James Johnson.  Mr. Johnson identified three separate critical violations of the TB MED 530:  salad in the reach-in refrigerator without a date or label, employees placing food receipts on top of sandwiches during the cooking process, and evidence of rodents throughout the facility, including droppings in dry storage and behind the ice maker.  App. 267-68.  Mr. Johnson also found seven noncritical violations, such as:  expired bread in the food preparation area, a dirty floor in the walk-in refrigerator area, food stains in the food storage room, and meat in the walk-in refrigerator without proper containment.  App. 268; Decl. of James Johnson.  Once more, Mr. Johnson noted an employee not wearing the proper hair restraint, and an employee wearing earrings.  App. 267.

On June 4, 2009, Mr. Johnson conducted yet another inspection.  App. 269-70; Decl. of James Johnson.  Although, there was evidence of rodent droppings, the deli had cured its sanitation violations.  App. 269; Decl. of James Johnson.  The deli received a satisfactory rating.  App. 269.

Then, in order to help management control the pest and rodent problem, on June 7, 2009, and July 8, 2009, both Ms. Gamble and Mr. Johnson conducted a Preventative Medicine Assistance Visit.  During both visits, the pair observed extra food-processing equipment stored improperly, rodent gnaw marks on packages of chips, and rodent droppings on napkins and in the storage areas under the service counter.  App. 271-72.  The inspectors provided rodent-control advice to plaintiff and offered recommendations for cleaning and disinfecting the deli.  Id.

On July 30, 2009, Mr. Johnson returned to conduct another Routine Food Establishment Inspection.  App. 273-74; Decl. of James Johnson.  During this inspection, he noted several noncritical violations, including:  the reach-in refrigerator was leaking water in the kitchen area, the kitchen floor was dirty, grease was found behind the grill area, dirt and debris was found in the walk-in refrigerator and freezer, rodent droppings were found on the premises, prepared salads in the refrigerator lacked a proper date, a secondary temperature monitoring device in the reach-in refrigerator in the front of the store was missing, the fountain drink machine was dirty, and boxes were stored on the floor in the dry storage and kitchen areas.  App. 273-74.  Once again, despite these violations, this inspection resulted in a satisfactory rating.  App. 273; Decl. of James Johnson.

On July 31, 2009, six months into the contract, Gail Bowman, the AAFES Service Business Manager ("SBM"), conducted a Personal Services Activity Review ("PSAR").  App. 275; Decl. of Gail Bowman.  Her review identified the following violations:  the facility was not clean and orderly in appearance, the kitchen floor was greasy, the soda machine shelves and the soda fountain area were dirty, the freezer contained raw chicken with no expiration date, and raw chicken was comingled with salad and dairy products.  App. 275-76; Decl. of Gail Bowman.

Ms. Bowman also determined that the concessionaire was not complying with the installation and AAFES fire, safety, and security regulations, or the applicable health and sanitary and environmental protection regulations.  App. 275-76.  With regard to plaintiff's employees, Ms. Bowman noted that they were not neatly dressed and groomed, nor were they wearing hairnets or name tags.  App. 275-76; Decl. of Gail Bowman.  She further noted that licenses and health certificates were neither current nor posted.  In addition, she found that in the absence of the manager, no other employee qualified as Serve Safe Certified.[5]  App. 275-76.  The inspection of the deli led her to conclude that the concessionaire was not in compliance with the performance specifications of the contract, and that the concessionaire was not providing the quality of service expected.  App. 275; Decl. of Gail Bowman.  Ms. Bowman gave the deli an unsatisfactory rating. App. 276; Decl. of Gail Bowman.

After Ms. Bowman's visit and unsatisfactory rating, on August 12, 2009, the AAFES contracting officer at the time, Heather Martinez, sent a letter to plaintiff requesting corrective action.  App. 277.  The corrective action letter listed each of the deficiencies observed during the PSAR and referenced the two failed MEDDAC inspections in April and May 2009.  Id.  The contracting officer requested that plaintiff "correct these deficiencies immediately" and stated: "Failure to comply will result in future contractual actions.  Please ensure corrective actions are taken to preclude recurrence."  Id.

One month after the corrective action letter, on September 14, 2009, Ms. Bowman returned to conduct another PSAR.  App. 278; Decl. of Gail Bowman.  Yet again, she found the facility dirty, food stored in the freezer without an expiration date, and that plaintiff was noncompliant with the fire, safety and security regulations, health and sanitary regulations, and environmental protection regulations.  Id.  As before, Ms. Bowman found that the employees were not neatly dressed or groomed nor were they wearing name tags or hairnets.  Id.  For the first time, Ms. Bowman observed that an employee was not wearing gloves.  Id.  Also, she found that plaintiff's licenses and health certificates were not current and posted.  Id.  During this inspection, Ms. Bowman further found that concessionaire-furnished equipment was not adequately or properly maintained.  Id.  Again, she reported that the concessionaire was not in compliance with the contract's performance specifications or providing the expected quality of service because the kitchen/preparation area, refrigerators, and freezers were in violation of the health and sanitation standards.  Id.  Plaintiff received its fourth unsatisfactory rating.  Id.

The very next day, a second Preventative Medicine Assistance Visit occurred on September 15, 2009, because John Murphy, manager of the food court, had reported unsanitary conditions in kitchens and rodents visible in the kitchen and dining areas.  App. 279.  During this inspection, the following violations were noted:  evidence of rodents and rodent excreta pellets, dried liquid spill under the shelf in the walk-in cooler, dried grease residue and a piece of trash underneath the flat grill and its stand, and dried grease residue on the exterior of the fryer unit and the hood in the kitchen.  App. 279-80.  Although plaintiff had made some progress to eliminate the pest and rodent problem from the cooking areas, the inspectors still concluded: "[S]anitation deficiencies continue at your restaurant despite your efforts to take necessary

---

[5]   This is required pursuant to TB MED 530, Chapter 2, Management and Personnel, ¶¶ 2-2a(2)(b) and 2-18.  App. 40-41; see also App. 139 (Appendix B, Model Risk Assessment Plan for Scheduling Food Sanitation Inspections, ¶ B-2 6(a)).

corrective actions." App. 280. The inspectors also concluded that the "establishment is considered a potential health risk," but advised that they would continue to work with plaintiff in order to ensure the health and welfare of the patrons. Id. They again provided a number of recommended actions to eliminate pests and disinfect the premises. App. 280-81.

On that same date, September 15, 2009, a Routine Food Establishment Inspection was conducted. App. 284; Decl. of James Johnson. Mr. Johnson found twelve noncritical violations: rodent droppings on the floor in the dry storage area, under the cash register, and in both the reach-in and walk-in refrigerators; and a dead rodent in the rear of the kitchen next to the exit door. Id. He also found items improperly labeled in the reach-in cooler and walk-in refrigerator, a broken reach-in refrigerator, paint peeling from the ceiling in the kitchen area, live cockroaches in the dry storage area, a dead pest in a trap dated June 2009, a gap in the walk-in refrigerator door, a hole on the back wall by the electric outlets, dry blood in the walk-in refrigerator on the floor, an odor in the dry storage area near the pots and pans, and grease and trash under the grill. App. 284-85; Decl. of James Johnson. Additionally, he found that the employees were not properly trained in food service. Id. TJ's Deli received an unsatisfactory rating. App. 284.

The next inspection of plaintiff's premises, a PSAR, was conducted on December 14, 2009, and TJ's Deli was assigned another unsatisfactory rating. App. 286; Decl. of Gail Bowman. Specific violations included: a dirty facility, noncompliance with installation, exchange fire, safety, and security regulations, and noncompliance with applicable health and sanitary, and environmental protection regulations. App. 286. The PSAR also revealed that all the trash receptacles were completely filled prior to the deli opening, the soda dispenser had a sticky substance and residue on the drink guard, debris was present on the drink station and under the soda dispenser, the dining room tables and floors were dirty, the floor was not swept, the freezer contained shellfish items stored with no date/expiration label and shrimp that appeared to be spoiled, and the underside of the freezer shelving was dirty with food and filthy. Id. And again, the concessionaire-furnished equipment was not adequately and properly maintained, and the concession employees were not neatly dressed, groomed, or wearing name tags. Id. It was noted that in violation of the contract, the manager was the only individual Serve Safe Certified and the employees had not attended any formal health/sanitation training. Id.

The next day, on December 15, 2009, Ms. Gamble arrived at TJ's Deli in order to conduct another Routine Food Establishment Inspection. She reported one critical and five noncritical violations, and again, the deli received an unsatisfactory rating. App. 287-88; Decl. of Maria Gamble. On this visit, Ms. Gamble observed a critical deficiency: an employee's failure to wash hands and change gloves after picking up a fallen paper receipt off of the dirty kitchen floor before preparing a sandwich. App. 287; Decl. of Maria Gamble. Repeat noncritical violations were also identified during this inspection: food handlers wearing unapproved jewelry while preparing food and a cashier walking into the food preparation area and preparing a sandwich without wearing a hair restraint. App. 287. Ms. Gamble also found holes in the walls and broken reach-in coolers in the kitchen, manager's office, and in the front cashier area. App. 288; Decl. of Maria Gamble. Once again, the cooking area was unclean to sight and touch. App. 288. There were dead cockroaches and food crumbs in the broken reach-in cooler in the kitchen, and pieces of trash and dirt on the floor by the trash can. Id. Ms.

Gamble also identified improper stock handling practices, rodent excreta pellets and onion peels on the floor by the walk-in cooler in the kitchen, rodent excreta pellets on the floor in the dry goods room, rodent excreta pellets on the floor in the manager's office, and no date or label affixed to prepared, packaged cheese in the walk-in cooler.  App. 289; Decl. of Maria Gamble.

Then, on December 22, 2009, during the follow-up inspection, TJ's Deli received yet another unsatisfactory rating.  App. 291-92; Decl. of Maria Gamble.  Ms. Gamble observed items still in need of repair:  holes in the wall in the dry goods room by the electrical utility box, and broken reach-in coolers in the kitchen, preparation station, and manager's office.  App. 291.

The next day, on December 23, 2009, Captain Christopher Colgrove, Chief, Environmental Health, MEDDAC, issued a memorandum for the Food and Beverage Program Manager concerning unsatisfactory conditions at TJ's Deli.  App. 293.  In the memorandum, he stated that "TJ's Deli has received two successive 'Unsatisfactory' food inspection reports from Environmental Health, dated 15 December and 22 December based primarily on poor sanitation and items in need of repair."  Id.  He reiterated the findings from the December 15, 2009, and December 22, 2009 inspections, and provided recommendations for corrective action.  App. 293-94.  The memorandum concluded by stating that a re-inspection of TJ's Deli would be conducted on December 30, 2009.  App. 294.

Therefore, on December 30, 2009, Ms. Gamble conducted a Routine Food Establishment Inspection.  The results of that inspection were not favorable for TJ's Deli, which received another unsatisfactory rating.  App. 295-96; Decl. of Maria Gamble.  Ms. Gamble found a critical violation:  a partially filled container of pesticides stored in the manager's office with product labeling cautioning that the pesticide should be used outdoors only and was not intended for use in a food establishment.  App. 295; Decl. of Maria Gamble.  She also observed and noted repeat and additional violations including:  areas unclean to sight and touch; spoiled and decaying food in various refrigerators; products stored in the reach-in refrigerator in the manager's office; dead cockroaches found inside the reach-in refrigerator; dead cockroaches and decaying food particles inside the basin of the superior warmer; and trash, onion peels, and other debris beneath the reach-in refrigerator.  App. 295-96; Decl. of Maria Gamble.  She also identified other noncritical violations:  holes in the wall and broken reach-in coolers in the kitchen and manager's office.

## C.  Contracting Officer's Cure Letter to Plaintiff

As a result of the unsatisfactory inspections, on January 4, 2010, the AAFES contracting officer sent a "cure letter" to plaintiff advising that it was in default of its contract by failing two Routine Food Establishment Inspection Reports:  September 15, 2009, and December 15, 2009.  App. 297.  In her letter, the contracting officer itemized the violations from the September 15, 2009 inspection.  Id.  She also reiterated the December 15, 2009 inspection violations.  App. 297-98.  The letter directed plaintiff to "correct all failed food deficiencies as outlined above immediately."  App. 298.  Further, plaintiff was advised to provide the contracting officer within five calendar days, the actions it proposed "to take to preclude recurrence of similar incidents[,]" and that if it failed to take corrective action and failed to comply with its contract, the contracting officer might terminate its contract for default.  Id.

8

**D.  The Final Routine Food Establishment Inspection**

On January 7, 2010, Ms. Gamble completed her last follow-up Routine Food Establishment Inspection at TJ's Deli.  App. 299-300; Decl. of Maria Gamble.  The inspection resulted in an unsatisfactory rating.  Id.  First, her inspection uncovered critical deficiencies: reheated and cooked trayed food items (shrimp and chicken strips) that were stored in the walk-in cooler without a date of preparation, and packages of prepared coleslaw and open frozen foods lacking proper labeling.  App. 300; Decl. of Maria Gamble.  Second, she found other noncritical violations, some recurring and some new, including:  unclean areas; trash from the day before; dampened trash particles and a strong odor noticed beneath the plastic bag within the trash can; rust and other filth on the ledge of the flat grill in the kitchen; trash and other debris inside/on top of the drain beneath the ice machine; filth on the floor by the drain for the ice machine; trash on top of the drain cover of the ice machine; trash and other filth on the floor in the walk-in freezer; trash and other filth on the floor beneath the pots and pan sink; and grease residue on the side of the flat grill in kitchen.  App. 300.

**E.  Tommy Johnson, Plaintiff's President and Manager of TJ's Deli, Responds to the Cure Letter**

Tommy Johnson, in his capacity as president of Coffee Connections, Inc., timely responded to the cure letter by letter dated January 11, 2010.  App. 303.  In his letter, he addressed first the September 15, 2009 violations.  App. 305.  According to Mr. Johnson, in his capacity as manager of TJ's Deli, he reported the ceiling problems, hole in the wall and broken walk-in refrigerator to the AAFES, and that as of January 5, 2010 all repairs had been completed.[6]  Id.  Mr. Johnson also stated that he had cleaned and mopped the necessary areas and disposed of the dead rodent and rodent droppings.  Id.  Mr. Johnson further responded that he had cleaned all greasy surfaces as well as properly labeled all the food items.  Id.  In regard to training, Mr. Johnson wrote that he had been told that training would be scheduled by the AAFES's SBM, but that the SBM was nonresponsive so he was providing one-on-one training to his staff.  Id.

Then, responding to the December 15, 2009 violations identified in the contracting officer's letter, Mr. Johnson advised that he terminated for other reasons the employee who had made a sandwich without proper hand washing and glove changing, had given training to the cashier regarding procedures when helping food service workers, cleaned and mopped the floors, as well as removed grease, and trash from the area.  App. 304-05.  He also stated that he properly labeled the cheese.  App. 304.  Mr. Johnson addressed the unclean area by stating that when inspectors "come in the middle of lunch, which they did, you will find debris on the floor and equipment not cleaned because it was being used or had been prior to being inspected."  Id.  In addition, he added:  "I have started conducting training for the employees so they can get a better sense of why things have to be done a certain way and to raise their awareness of proper food safety and sanitation."  Id.  He further advised:  "I will call the work orders in to ensure the

---

[6] Mr. Johnson's previous contact regarding the broken equipment to the AAFES was by telephone and not in writing as required by the contract.  See App. 314-15.

requests are being processed and I will begin putting my communications in writing to the AAFES [SBM]." Id.

**F.  MEDDAC Memorandum and Plaintiff's Request for Reconsideration**

Shortly thereafter, on January 13, 2010, Colonel Charles W. Callahan at MEDDAC issued a memorandum that recommended all food service operations at TJ's Deli immediately cease as a result of his classification of TJ's Deli as a public health risk.  App. 305.  In the memorandum, Colonel Callahan reiterated the unsatisfactory ratings that the deli had received, including its fourth consecutive unsatisfactory rating it received after the follow-up inspection that had been conducted on January 7, 2010.  Id.  The memorandum also noted the three previous unsatisfactory inspections conducted on December 15, 22, and 30, 2009, as well as identified the three critical deficiencies and nine noncritical deficiencies.[7]  Id.  He concluded: "[T]his establishment is considered a Public Health risk and all food service operations should cease immediately.  Preventative Medicine will take all the necessary actions to ensure the general health, safety and welfare of the patrons and its employees."  Id.  As a result, plaintiff terminated its deli operations on January 14, 2010.  Id.

On January 15, 2010, Tommy Johnson wrote a letter to the garrison commander, Colonel Blix, providing him with information relating to the closure of TJ's Deli and requesting reconsideration of the AAFES's decision.  App. 306-07.

**G.  Contract Termination**

On January 19, 2010, the AAFES terminated plaintiff's concession contract for breach pursuant to Clause 8(a).[8]  App. 308.  The notice of termination set forth the following breaches of the contract:  (1) failure to comply with the direction of the contracting officer's August 12, 2009 warning letter, and January 4, 2010 cure letter requiring plaintiff to correct the deficiencies identified in the Inspection Reports; (2) failure to keep the premises clean, orderly, secure, and sanitary, and comply with the installation/exchange fire, safety, and security regulation and applicable health and sanitation and environmental protection  regulations; (3) failure to require personnel to meet the health and security standards prescribed by the contract and the applicable regulation; (4) failure to require personnel to be neat and clean, and to require customer contact personnel to wear attire typical of styles commonly used by the better local commercial facilities

---

[7]  Deficiencies were classified in accordance with TB MED 530, and the critical deficiencies were as follows: paragraph 2-8, Hands and Exposed Arms, Clean Condition; paragraph 3-55, Ready-to- Eat, PHF, Date Marking and Disposition; paragraphs 11-3, 11-5, Poisonous or Toxic Materials Presence, conditions of use.  In addition, the memorandum noted that plaintiff repeatedly failed to meet the requirements of TB MED 530, paragraph 2-12, Jewelry Prohibition; paragraph 2-16, Hair Restraints Effectiveness; paragraph 3-63, Food Labels; paragraph 5-34, Stock Handling Practices; and paragraph 6-15(a)(b), Repair and Cleaning Frequency.  App 305.

[8]  Clause 8(a) provides: "[T]his contract may be terminated in whole or in part by either party immediately upon written notice to the other party in the event of breach of this contract by the other party."  App. 212.

of the same trade and as approved by the contracting officer; (5) failure to comply with military public health and sanitation criteria to include the cleanliness of equipment, utensils, and display areas, and adequate refrigeration for perishable foods; and (6) failure to require personnel to wear clean uniforms, maintain a high degree of personal cleanliness, and conform to basic hygienic practices and for concessionaire, manager, and employees operating a food service facility to meet the applicable food service sanitation training requirements.  App. 308-09. The letter advised that it was the final decision of the contracting officer.  App. 310.

## H.  Plaintiff's Complaint

On January 18, 2011, plaintiff filed its complaint in this court challenging the government's decision to terminate its contract.  Compl. ¶ 3.  In its initial complaint, plaintiff requested declaratory judgment that it "substantially complied with its obligations under [the contract]" and that "AAFES wrongfully terminated [the contract]."  Id. at 25 (Prayer for Relief). On October 22, 2012, plaintiff filed an amended complaint asking the court to award damages incurred as a result of the improper termination of plaintiff's contract, as well as challenging the government's decision to terminate plaintiff's contract.  Am. Compl. ¶ 4.   Plaintiff seeks damages in the amount of $51,227 for termination-related costs and thirty-days lost profits.  Id. at 25 (Prayer for Relief).  In response, defendant filed a motion to dismiss, or in the alternative, for summary judgment.  Briefing is complete and the court held oral argument on November 21, 2013.  For the reasons set forth below, the court denies defendant's motion to dismiss, but grants defendant's motion for summary judgment.

## JURISDICTION

The Tucker Act confers upon the United States Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ."  28 U.S.C. § 1491(a)(1) (2006).  Since the Tucker Act does not "create any substantive right enforceable against the United States for money damages," United States v. Testan, 424 U.S. 392, 398 (1976), the right to money damages must be found in a separate source of law, Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc); accord Martinez v. United States, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (en banc).  "[I]n a contract case, the money-mandating requirement for Tucker Act jurisdiction is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary."  Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011).  As discussed below, however, defendant challenges the court's jurisdiction to entertain plaintiff's claims on other grounds.

## DISCUSSION

## A.  RCFC 12(b)(1) Motion to Dismiss

When deciding a motion to dismiss, the court assumes all factual allegations set forth in the complaint are true and draws all reasonable inferences in the plaintiff's favor.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir.

2006).  Because the court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion," Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999), the court analyzes defendant's motion under RCFC 12(b)(1).

The burden of establishing the court's subject-matter jurisdiction resides with the party seeking to invoke it, see McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936), and a plaintiff must establish jurisdiction by a preponderance of the evidence, Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction.  See McNutt, 298 U.S. at 189.  When ruling upon a motion to dismiss for lack of subject-matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes.  See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747.  If the court finds that it lacks subject-matter jurisdiction, then it must dismiss the claim.  RCFC 12(h)(3).

This case arises from plaintiff's concession contract with the AAFES to operate a deli at Fort Belvoir.  See Am. Compl. ¶¶ 1-4 (alleging that defendant breached its concession contract with plaintiff).  The contract contains a disputes clause that lays out the administrative process to be taken by the contractor in the event there is a dispute between the contractor and AAFES.  See supra Part I.A; see also App. 212-13.  The disputes clause of the contract states that it is subject to the CDA, and sets forth the additional steps that need to be taken by the contractor in order to file a claim.  App. 212-13.

Though contract claims are generally subject to the CDA, the CDA does not apply to concession contracts.  See generally Terry v. United States, 98 Fed. Cl. 736 (2011) ("[C]oncession contracts are not contracts within the meaning of [the] Contract Disputes Act[] and are not service or procurement contracts within the meaning of statutes, regulations, or policies that apply to federal service contracts or other types of federal procurement actions."); 36 C.F.R. § 51.3 (2008).  This is true even if the contract states that the CDA applies because "only Congress can waive sovereign immunity; parties may not by contract bestow jurisdiction on a court."  Pacrim Pizza Co. v. Pirie, 304 F.3d 1291, 1293-94 (Fed. Cir. 2002); see also Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701-02 (1982) ("[Federal court jurisdiction is] limited to those subjects encompassed within a statutory grant of jurisdiction. . . . [N]o action of the parties can confer subject matter jurisdiction upon a federal court."); RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1461 (Fed. Cir. 1998).  Accordingly, the CDA's administrative procedures have no application and a plaintiff would not be required by the statute to file an administrative claim prior to filing suit in this court.  See Frazier v. United States, 67 Fed. Cl. 56, 58-59 (2005).  The question, therefore, becomes what effect, if any, does the incorporation of the CDA in this contract have on the disputes clause?

Defendant argues that this court lacks jurisdiction because plaintiff was bound by the terms of the contract requiring plaintiff to first submit a claim, for a sum certain, to the contracting officer, which plaintiff did not do.  According to defendant, the language of the contract's disputes clause controls and specifically includes reference to the CDA.  And of course, there is a presumption that "when a federal government contract contains a disputes clause setting forth specific administrative remedies, the contractor must exhaust those remedies

before pursing judicial relief." <u>Doe v. United States</u>, 106 Fed. Cl. 118, 122 (2012) (citation omitted); <u>see also</u> <u>Me. Yankee Atomic Power Co. v. United States</u>, 225 F.3d 1336, 1340 (Fed. Cir. 2000) ("It is now crystal clear that the contractor must seek the relief provided for under the contract or be barred from any relief in the courts."); <u>PDR, Inc. v. United States</u>, 78 Fed. Cl. 201, 205-07 (2007) (dismissing complaint for lack of jurisdiction due to the failure to follow the administrative remedy procedure under disputes clause). Relying on these cases, defendant asserts that even though the CDA does not apply to concession contracts, here, it is merely seeking to enforce a specific term of the parties' contract – an administrative disputes process requiring the contractor to submit a claim for monetary damages with a sum certain requiring the contracting officer to issue a final decision within sixty days. Thus, even though the CDA does not apply to concession contracts as a general rule, according to defendant, that does not preclude the court from enforcing a contractual clause incorporating the same pre-suit requirements of the CDA. Instead, defendant argues, this court should "interpret the contract in a manner that gives meaning to all of its provisions and makes sense." <u>McHugh v. DLT Solutions, Inc.</u>, 618 F.3d1375, 1380 (Fed. Cir. 2012); <u>accord</u> <u>Hercules, Inc. v. United States</u>, 292 F.3d 1378, 1381 (Fed. Cir. 2002) (construing the contract to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract).

Whether the contract's disputes clause, which engrafts the CDA requirements, applies is significant in this case because it is uncontested that plaintiff's claim did not include a request for a "sum certain" as required by the disputes clause. Plaintiff argues that it was not obligated to file a claim with the contracting officer because the CDA does not apply to concession contracts. Plaintiff is correct.

Contrary to defendant's view, there are circumstances that permit a plaintiff to avoid a contract's disputes clause requirement. The case law of this court is clear: "[A]dministrative exhaustion requirements are excusable upon 'clear evidence' that an administrative remedy would be 'inadequate or unavailable.'" <u>SUFI Network Servs. Inc. v. United States</u>, 102 Fed. Cl. 656, 659 (2010); <u>see</u> <u>United States v. Anthony Grace & Sons, Inc.</u>, 384 U.S. 424, 429-30 (1966) (citing <u>United States v. Joseph A. Holpich Co.</u>, 328 U.S. 234, 239-40 (1946) (noting that where the disputes clause appeals process is inadequate or unavailable, administrative exhaustion is not necessary)); <u>see also</u> <u>United States v. Blair</u>, 321 U.S. 730, 736 (1944). It is true, in most instances, that the presumption is in favor of the administrative remedy, yet the presumption is rebutted "with clear evidence that the administrative remedy would be prejudicial due to procedural flaws." <u>SUFI Network Servs.</u>, 102 Fed. Cl. at 659.

Here, as plaintiff points out, parts of its concession contract are flawed, specifically, the portion that attempts to engraft the CDA, a provision that is unenforceable in a concession contract. For example, section (f) of the disputes clause mirrors the CDA by providing:

> f. The contracting officer will mail or otherwise furnish a written decision in response to a contractor claim, within the time periods specified by law. Such decision will be final and conclusive unless:

(1)  Within 90 days from the date of contractor's receipt of the final decision the contractor appeals the decision to the Armed Services Board of Contract appeals (ASBCA), or

(2)  Within 12 months from the date of contractor's receipt of the final decision the contractor brings an action in the United States Court of Federal Claims.

App. 213.  The language "periods specified by law" relates to the language of the CDA, thereby rendering this provision unworkable because the CDA does not apply to concession contracts.[9] Consequently, the provision is meaningless and unenforceable.  The "periods specified by law" under the CDA are defined in 41 U.S.C. § 7103.  This section guides a contracting officer with issuing decisions.  Here, because the CDA does not apply, there are no time periods that dictate when the contracting officer must furnish a written decision.  Thus, in the absence of controlling law, the contract mandates that the plaintiff must submit a claim to the contracting officer, but the contract does not mandate that the contracting officer issue any timely decision on that claim. The result is a contract disputes clause that is flawed and unworkable.  Against this backdrop, that plaintiff did not file a claim with a sum certain is of no moment.

Defendant asks the court to ignore this fact and instead apply "the spirit" of the agreed upon contract.  But, the contract at issue was drafted by defendant and contains the government's boilerplate CDA contract language.  It is the government's responsibility, when preparing contract documents for its concessionaires to sign, to present a contract document that is in accordance with law.  Here, the government presented plaintiff with at contact document containing provisions that were contrary to law.  The court declines to disregard that fact.  In sum, the evidence is clear that the contract is procedurally flawed by incorporating the CDA into the contract, and because the CDA is inapplicable the court must treat this suit as a standard breach of contract suit under the Tucker Act, a suit over which the court may exercise jurisdiction.  Defendant's motion to dismiss is, therefore, denied.

## B.  RCFC 56 Motion for Summary Judgment

Having found that it possesses jurisdiction, the court directs its attention to defendant's alternative motion, its motion for summary judgment.  In order to grant a motion for summary judgment, there can be no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing Armco, Inc. v. Cyclops Corp., 791 F.2d 147, 149 (Fed. Cir. 1986)).  Additionally, when the court considers a motion for summary judgment, the evidence must be viewed, and inferences drawn, in a light most favorable to the non-moving party.  Litton Indus. Prods., Inc. v. Solid State Sys. Corp., 755 F.2d 158, 163 (Fed. Cir. 1985).  The nonmoving party may not simply rest on the pleadings, but is required to come forward with relevant, admissible, and specific evidence demonstrating a genuine issue of material fact.  RCFC 56(e).  "[B]ald assertions and speculation do not create an

---

[9]  Defendant's use of a contract that appears to confer jurisdiction upon this court violates the teachings of Pacrim Pizza, 304 F.3d at 1293-94 (precluding parties from bestowing jurisdiction on a court by contract).

evidentiary conflict sufficient to defeat a summary judgment motion." Lathan Co. v. United States, 20 Cl. Ct. 122, 125 (1990) (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984)). The court determines whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson, 477 U.S. at 250-52. In such a case, there is no need for the parties to undertake the time and expense of trial, and the moving party should prevail without further proceedings. When the issue is one of contract interpretation, it is a question of law suited to resolution by summary judgment. Gentex Corp. v. Donnelly Corp., 69 F.3d 527, 530 (Fed. Cir. 1995); Takota Corp. v. United States, 90 Fed. Cl. 11, 17 (2009) ("[I]nterpreting the requirements of contractual language is a question of law and may be resolved by summary judgment.").

Plaintiff contends that this case is not amenable to summary judgment because in making the determination whether default is excusable (or if there was a default at all), this court must decide questions of fact. See Marley v. United States, 191 Cl. Ct. 205, 214 (1970) ("Whether a default is excusable is most often a question of fact."). Plaintiff argues that since the facts are in dispute, and all inferences must be drawn in favor of plaintiff, the case is not ripe for summary judgment. Conversely, defendant asserts that the facts are undisputed and clear: the AAFES properly exercised its discretion to terminate the contract because plaintiff failed to abide by the terms of the contract concerning food safety, health, hygiene, and sanitation. Defendant relies upon the contract provision that states: "[T]his contract may be terminated in whole or in part by either party immediately upon written notice to the other party in the event breach . . . ." App. 212. Thus, defendant argues the decision to terminate the contract for breach is discretionary and there is no abuse of discretion by the contracting officer in terminating the contract.

Defendant submits two avenues for summary judgment. First, defendant argues that the contract, as a matter of law, provides for a no-fault notice termination, precluding termination costs or breach damages as relief. Second, defendant argues that plaintiff's noncompliance with the contract's applicable health and sanitation requirements warranted the AAFES's termination of the contract for breach. The court will address defendant's second argument first.

The court agrees with defendant that despite having found that the CDA language of the contract has no application, the contract's provisions concerning breach remain valid and enforceable.[10] Pursuant to the contract, plaintiff was required to, among other things, comply with applicable health and sanitation regulations, undergo routine inspections to confirm compliance, and provide services "equal to those provided by first quality commercial

---

[10]     "When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory . . . . " Am. Tel. & Tel. Co. v. United States, 177 F.3d 1368, 1376 (Fed. Cir. 1999); see also GHS Health Maint. Org., Inc. v. United States, 76 Fed Cl. 339, 375 (2007) (reforming contracts to remove provision found in violation of statute).

establishments." App. 230.  The undisputed facts show that plaintiff failed to so.  Critical violations of TB MED 530 began to occur three months into the contract.  Specifically, on April 2, 2009, three critical violations occurred:  (1) the presence of three one-gallon containers of milk with a sell-by date of March 31; (2) cheese used in the preparation of sandwiches sat out indefinitely without refrigeration; and (3) raw chicken not properly dated and labeled.  This was not the only instance of critical violations.  Critical violations were further noted during inspections that occurred on April 13, May 28, December 15, and December 30, 2009; and on January 7, 2010.  These critical violations included:  lettuce being prepared in the same sink as dish-washing activities, salad found in the refrigerator without a date or label, employees placing tickets on top of sandwiches during the cooking process, evidence of rodents and droppings, employees failing to wash hands when making a sandwich, reheated and cooked trayed items (shrimp and chicken strips) stored in the walk-in cooler without a date of preparation, and pesticides stored in the manager's office bearing a label that they were not for use in a food establishment.

Noncritical violations of TB MED 530 were also routinely found during inspections.  For instance, the inspectors commonly found food debris and dirt on the floor of the walk-in refrigerator and deli, dirty walls, areas unclean to sight and touch, grease behind the grill area, expired food, meat in improper containment, dirty soda dispenser area, food handlers wearing unapproved jewelry, employees not wearing hair restraints, employees not properly trained, proper licenses neither current nor posted, and the presence of rodent pellets.

The substantial, well-documented adverse evidence notwithstanding, plaintiff argues that it substantially complied with the terms of the contract.  Am. Compl. ¶ 3.  However, the doctrine of substantial performance "is not available in this case to excuse the substantial deviations from acceptable performance . . . ."  Int'l Verbatim Reporters, Inc. v. United States, 9 Cl. Ct. 710, 717 (1986).  The doctrine does not compel or require the nondefaulting party to accept a measure of performance fundamentally less than had been bargained for.  Id. (citing Franklin E. Penny Co. v. United States, 524 F.2d 668, 677 (Ct. Cl. 1975)).  In a concession contract, where food safety and sanitation is paramount to protect the public health, the concept of substantial performance is not appropriate.  The agency provided plaintiff numerous opportunities to remedy its sanitary deficiencies.  As with any contract, plaintiff had an obligation to know the terms of the contract and the standards in TB MED 530 that it was required to meet, and to ensure that its employees met those standards.

Here, the contracting officer considered the degree, nature, and repetition of plaintiff's violations and ultimately used her discretion to terminate plaintiff for default.  The contracting officer relied upon the January 13, 2010 memorandum from Colonel Callahan stating:

> [A]t this time this establishment is considered a Public Health risk and that all food service operations should cease immediately.

> The following are the breaches of the Contract by the Contractor:

> In breach of General Conditions of the Contract clause 8, the Contractor has failed to comply with a direction of Contracting Office's warning letter dated 12 August 2009 and 4 January 2010 cure letter

requiring the Contractor to correct the deficiencies that were identified in the Inspection Reports;

In breach of Exhibit C, Special Provisions, Paragraph 2b, of the Contract, the Contractor has failed to comply with the Contract Provision which requires the Contractor (Concessionaire) to keep the premises clean, orderly, secure, and sanitary, and comply with the installation/exchange fire, safety and security regulation and applicable health and sanitation and environmental protection regulations;

In breach of Exhibit C, Special Provisions, Paragraph 17e, of the Contract, the Contractor has failed to comply with the Contract Provision which requires the Contractor to meet the health and security standards prescribed by the Contract and the applicable regulation;

In breach of Exhibit C, Special Provisions, Paragraph 17f, of the Contract, the Contractor has failed to comply with the Contract Provision which requires the Contractor Concession personnel to be neat and clean, and requiring the Customer contact personnel to wear attire typical of styles commonly used by the better local commercial facilities of the same trade and as approved by the Contracting Officer;

In breach of Exhibit H, Special Provisions, Food Processing and Sanitation, Paragraphs 2b., 2c., 2e., of the contract, the Contractor has failed to comply with military public health and sanitation criteria to include cleanliness of equipment, utensils, and display areas, adequate refrigeration for perishable foods….; that all plant facilities, machinery, equipment, and apparatus used in the production, processing, handling, storage [sic] and that delivery of items under the contract and all items delivered under the contract will meet the sanitary standards prescribed in the current edition of MIL-STD-1105C, Military Standard Sanitary Standards for Bakeries; and

In breach of Exhibit H, Special Provisions, Employees, Paragraphs 4a, & 4g, of the Contract, the Contractor has failed to comply with a Special Provision which requires the Contractor Concession personnel to wear clean uniforms, maintain a high degree of personal cleanliness and conform to basic hygienic practices[;] and for concessionaire, manager and employees operating a food service facility to meet the food service sanitation training requirements IAW [in accordance with] EOP 25-4 and ESR 1-2.

App. 308-09.

The contracting officer did not exercise her discretion to terminate plaintiff's contract for breach until after a year of repeated failures by plaintiff to comply with its contractual

requirements to maintain food safety, health, hygiene, and sanitation standards. Consequently, plaintiff's critical violations justified the contracting officer's discretionary decision to terminate for breach. App. 308-10.

Plaintiff also argues that it is excused from its failure to comply with the contract because it was unable to remedy the holes in the walls or the broken equipment identified by the inspectors. Am. Compl. ¶ 34. These items, plaintiff argues, were outside of its control and instead were the responsibility of the AAFES at Fort Belvior. Furthermore, plaintiff alleges that the rodent activity identified by the inspectors was the direct result of the failure of the AAFES to uphold its promise to properly repair the holes in the walls. Id. ¶ 47. Therefore, plaintiff argues, it cannot be terminated because its non-compliance with health and sanitation requirements was, at least in part, attributable to the AAFES.

Plaintiff is incorrect. The termination clause of the contract did not provide for excusable default. It simply provided either party the right to terminate the contract immediately in the event of breach. App. 212; see Fla. I.Q. Computer Corp. v. United States, 228 Ct. Cl. 748, 748 (1981) (noting that the termination clause of the contract did not provide for excusable default). Moreover, setting to one side the issue surrounding rodent activity, plaintiff's violations concerning unsanitary conditions (dirt, grease, rodent excrete pellets, and cockroaches), cleaning frequency, stock handling practices, hands and exposed arms, date marking and disposition, poisonous or toxic materials, jewelry prohibition, hair restraints, training of employees, food handling, and food labels are sufficient to sustain the contracting officer's discretionary decision to invoke the default termination clause. Plaintiff cannot show that these violations were primarily caused by the actions of the government. To the contrary, these violations are solely attributable to plaintiff. Fla. I.Q., 228 Ct. Cl. at 748 (upholding Armed Services Board of Contract Appeal's decision that the termination was proper because plaintiff's failure to perform was not due to factors beyond the control of and without the fault of plaintiff).

The cumulative effect of the repeated health and safety violations at the deli deprived defendant of a critical aspect of the contract: the safe and sanitary environment for which it bargained. The contract was specific with regard to the expectations of food safety and sanitary conditions. A critical element of the concession contract was its reference to and the inclusion of TB MED 530. TB MED 530 clearly states that its intent "is to place primary emphasis on the food and the food employees handling the food without neglecting or compromising the need for a strong sanitation program," and "to focus on understand[ing] the causes of foodborne illnesses, by observing food preparation and handling practices, and to implement controls . . . ." App. 36. Thus, when operating a food concession, it is essential that a concessionaire serve food that is safe to eat. Here, the violations clearly show that plaintiff's noncompliance, even without regard to the rodent problem and repairs that were slow in occurring, rose to the level of a public health risk as stated by Colonel Callahan. Tommy Johnson, as manager of TJ's Deli, could have easily directed the removal of the dead rodent's carcass and disposed of it properly, swept up the rodent pellets, swept the floors of the deli, emptied the garbage containers, washed the walls and counters, provided training to his staff, inspected his staff for hair restraints and gloves, and so on. But despite numerous opportunities to cure the problems within plaintiff's control, it failed

to cure critical (and noncritical) violations.  Thus, the AAFES's termination of the contract for breach was proper.[11]

## CONCLUSION

For the reasons set forth above, the court hereby **DENIES** defendant's motion to dismiss and **GRANTS** defendant's motion for summary judgment.  The clerk is directed to enter judgment accordingly.  No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[11]   The government invites the court to make a finding in the abstract that it could have invoked the contract provision regarding no-fault termination.  It would be inappropriate for the court to rule on a hypothetical as it would be in essence rendering an advisory opinion.  Moreover, the court need not address defendant's no fault termination argument in light of its conclusion that defendant is entitled to summary judgment on other grounds.